IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

TERRY GILLIAM,

      Plaintiff,

v.                               CASE NO. 2:09-cv-00138

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Terry Lee Gilliam (hereinafter referred to as "Claimant"), filed an application for DIB on July 6, 2004, alleging disability as of June 5, 2004, due to a back injury, right shoulder/leg problems, depression and anxiety. (Tr. at 500-01, 517.)[1] The relevant time period for this claim is June 5, 2004,

---

[1] Claimant had previously filed an application for DIB, alleging disability beginning May 18, 2001. (Tr. at 65-67, 413.) The claim was denied at all administrative levels, and Claimant filed an appeal in this court. The undersigned recommended that the ALJ's decision, dated April 2, 2004, was supported by substantial evidence, and the presiding District Judge adopted the recommendation and affirmed the denial of benefits. (Tr. at 440-41.) This court's proposed findings and recommendation, which was adopted by the presiding District Judge, can be found at document number 18 in Gilliam v. Barnhart, Civil Action Number 2:04-cv-00790.

through December 31, 2006, the expiration of Claimant's insured status. The claim was denied initially and upon reconsideration. (Tr. at 442-46, 449-52.)   On May 16, 2005, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 453.) The hearing was held on May 11, 2006, before the Honorable Theodore J. Burock.[2]  (Tr. at 809-29.)   The ALJ held a supplemental hearing on September 20, 2006. (Tr. at 782-808.)  By decision dated April 25, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 413-30.)  The ALJ's decision became the final decision of the Commissioner on January 15, 2009, when the Appeals Council denied Claimant's request for review. (Tr. at 406-09.)  On February 16, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).   A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential

---

[2] ALJ Burock also issued the decision on the previous application noted above.

evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2007).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 404.1520(f) (2007).  The Commissioner must show two things:  (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has

3

the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore   v.   Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 416.)   Under the second inquiry, the ALJ found that Claimant suffers from the severe impairment of mild degenerative disc disease of the lumbar spine. (Tr. at 416.)   At the third inquiry, the ALJ concluded that Claimant's impairment does not meet or equal the level of severity of any listing in Appendix 1.   (Tr. at 417.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.   (Tr. at 417.)   As a result, Claimant cannot return to his past relevant work.   (Tr. at 428.)   Nevertheless, the ALJ concluded that Claimant could perform jobs such as small parts assembler, parking lot attendant   and   non-governmental   mail   clerk,   which   exist   in significant numbers in the national economy.   (Tr. at 429.)   On this basis, benefits were denied.   (Tr. at 430.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to scrutinize the record as a whole to determine whether the

conclusions reached are rational." Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the

Commissioner in this case is supported by substantial evidence.

Claimant's Background

Claimant was forty-nine years old on June 5, 2004, the date of

alleged onset of disability, and fifty-one years old when his

insured status expired on December 31, 2006.  (Tr. at 813.)

Claimant graduated from high school and attended three years of

college.  (Tr. at 813, 866.)  In the past, he worked in a retail

hardware store, as a purchasing agent in construction and as a

laborer.  (Tr. at 813, 884-85.)

The Medical Record

The court's summary of the medical evidence from Claimant's previous application is contained in the proposed findings and recommendation noted above.

The court has reviewed all evidence of record related to the current application, including the medical evidence of record, and will summarize it briefly below.

On August 8, 2001, Alfredo C. Velasquez, M.D. examined Claimant in connection with Claimant's workers' compensation claim related to a workplace injury on May 8, 2001. Dr. Velasquez diagnosed lumbosacral muscle strain with nerve root irritation of L5-S1 on the right. Dr. Velasquez noted that review of an MRI showed a bulging disc between L4-L5 towards the left side. (Tr. at 589.)

On April 26, 2003, Sunny S. Bell, M.A. examined Claimant in conjunction with a psychiatric evaluation by Ahmed D. Faheem, M.D. and in connection to his workers' compensation claim. Ms. Bell diagnosed major affective illness (depression) and alcohol abuse on Axis I and borderline intellectual functioning on Axis II. (Tr. at 595.)

On April 26, 2003, Dr. Faheem examined Claimant and diagnosed major affective illness (depression) and alcohol abuse on Axis I and made no Axis II diagnosis. (Tr. at 600.) He estimated

6

Claimant's GAF at 60.[3]   (Tr. at 601.)   Dr. Faheem noted that outpatient psychiatric treatment helped his condition, but that for workers' compensation purposes, Claimant was entitled to a four percent permanent partial disability based upon his psychiatric impairment.   Dr. Faheem opined that Claimant could benefit from medication and that Claimant should receive treatment for alcohol abuse.   (Tr. at 601.)

On June 28, 2004, Constantino Y. Amores, M.D. examined Claimant at the request of his treating physician, Ulysses D. Agas, M.D.   His impression was lumbar spondylosis.   He also noted co-morbidities, including somatoform pain disorder, depression, GERD, hypertension and gastric ulcer.   He recommended conservative, nonsurgical treatment including a drastic reduction in activity to minimize aggravating the problem.   He recommended anti-inflammatory agents and, eventually, physical therapy.   He also recommended a comprehensive multidisciplinary pain and rehabilitation program. (Tr. at 603.)

On August 31, 2004, Uma Reddy, M.D., a State agency medical source, completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with

------

[3] A GAF rating between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)," while a GAF score of 65 indicates mild symptoms of an individual who is "generally functioning pretty well." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32, 34 (4th ed. 1994).

7

occasional postural limitations and a need to avoid concentrated exposure to vibration and hazards.   (Tr. at 610.)

On September 13, 2004, Debra L. Lilly, Ph.D., a State agency medical source, completed a Psychiatric Review Technique form and opined that Claimant's borderline intellectual functioning, mood disorder, panic disorder and alcohol abuse were severe impairments, but that Claimant had only mild restriction in activities of daily living, maintaining social functioning and in maintaining concentration, persistence and pace and no episodes of decompensation.   (Tr. at 625.)   Dr. Lilly wrote that "ALJ - is limited to routine, repetitive tasks.   Evidence continues to support this level of restrictions. ALJ given controlling weight." (Tr. at 628.)

On September 13, 2004, Dr. Lilly completed a Mental Residual Functional Capacity Assessment and opined that Claimant was moderately limited in the ability to understand, remember and carry out detailed instructions.   (Tr. at 630-31.)   She observed that "[p]er recent ALJ decision, the claimant retains the ability to learn and perform routine, repetitive tasks."   (Tr. at 632.)

On February 28, 2005, Marcel Lambrechts, M.D., a State agency medical source, completed a Physical Residual Functional Capacity Assessment and opined that Claimant was limited to light work, with occasional postural limitations, and a need to avoid concentrated exposure to vibration and hazards.   (Tr. at 654-59.)   Dr.

8

Lambrechts wrote that

> [i]n the past year he has been seen only twice for back
> pain.  His mental status does not look good as he appears
> to be more depressed than before.  Of interest he has a
> history of ETOH abuse, anxiety and panic attacks.  This
> could have influenced his physical symptoms.  He has some
> lumbar spasm as before but he also has complained of neck
> and shoulder pain alon[g] with right leg, hip and foot.
> No current physical reports in file about these symptoms
> except a note in a physical report that he suffers from
> somatoform disorder (Ref. 6-28-04, Dr. Agas.)    RFC
> remains as before.

(Tr. at 659.)  On March 15, 2005, Dr. Lambrechts added a note to
this statement in which he stated: "not informed about ALJ decision
- agree [with] decision and corrected the standing [and] walking to
4 hrs [at] most [with] ability to stand, walk or sit on different
periods - otherwise no changes [were] needed."  (Tr. at 659.)  It
appears that Dr. Lambrechts then manually check marked on the
assessment that Claimant must periodically sit and stand to relieve
pain or discomfort.  (Tr. at 655.)

On March 10, 2005, Robert Solomon, Ed.D., a State agency
medical source, completed a Psychiatric Review Technique form and
opined that Claimant's impairments were not severe.  (Tr. at 634-
46.)  As with Dr. Lilly, Dr. Solomon rated Claimant's four areas of
functioning as mild, mild, mild and none.  (Tr. at 644.)  He too
stated that the previous ALJ's decision was given full weight.
(Tr. at 646.)

The record includes treatment notes from Logan-Mingo Area
Mental Health, Inc., where Claimant was treated by I. Ahmad, M.D.

9

and others.   On January 16, 2004, Claimant reported to Dr. Ahmad that he was "doing 'ok'" with no crying spells, Claimant's mood and energy levels were better, and Claimant had good appetite and sleep.   Claimant continued to drink eight to twelve beers per day. Dr. Ahmad observed that Claimant showed lack of insight about drinking.   Dr. Ahmad diagnosed mood disorder due to underlying medical condition.   (Tr. at 668.)   On March 26, 2004, Woodville N. Browning, M.A. updated Claimant's social history.   Mr. Browning diagnosed mood disorder, major depressive disorder, recurrent, panic disorder without agoraphobia and alcohol abuse on Axis I.   He made no Axis II diagnosis.   He rated Claimant's GAF at 65.   (Tr. at 675.)   On April 5, 2004, a treatment note indicates that a medical review was completed in "doctor's absence."   (Tr. at 671.) Claimant was doing well and "per Dr. Ahmad" Claimant was prescribed Celexa and was to return in three months.   (Tr. at 671.)   On July 14, 2004, Claimant reported to Dr. Ahmad that he had run out of medication because Dr. Ahmad had not filled out the proper paperwork.   Claimant reported experiencing panic attacks on and off.   Dr. Ahmad diagnosed major depressive disorder, recurrent, panic disorder without agoraphobia and alcohol abuse.   (Tr. at 670.)

On November 19, 2004, Dr. Ahmad noted that Claimant reported his nerves were "ok" but that he felt depressed and sad with a low energy level and poor sleep.   Claimant continued to drink eight

beers per day.  Claimant's medication appears to have been changed, but the note is illegible.  (Tr. at 667.)  On February 15, 2005, Claimant reported to Dr. Ahmad that he was doing alright.  Claimant remained compliant with medication and reported a decline in alcohol consumption.  Dr. Ahmad continued Claimant on his current medications.  (Tr. at 666.)  On March 10, 2005, Dr. Ahmad noted that Claimant was stressed out and worrying a lot.  Claimant continued to drink three to four times per week.  Dr. Ahmad's diagnoses remained the same.  (Tr. at 735.)  On May 12, 2005, Dr. Ahmad noted that Claimant felt "ok" and had no crying spells. Claimant denied any recent panic attacks and reported drinking four to six beers three times per week.  Dr. Ahmad continued Claimant on his medications.  (Tr. at 665.)

The record includes individualized outpatient treatment plans from Mr. Browning dated October 8, 2003 (GAF of 65), October 28, 2003, January 6, 2004 (GAF of 70), March 26, 2004 (GAF of 65), May 3, 2004 (GAF of 55), and November 19, 2004 (GAF of 55).  (Tr. at 678-88.)

The record includes treatment notes from Ulysses D. Agas, M.D., dated October 16, 2003, through May 13, 2005.  (Tr. at 689-728.)  Dr. Agas treated Claimant for chronic back pain, bulging disc and muscle spasm.  He prescribed Vicodin and Lorcet.

On November 19, 2005, Dr. Ahmad noted that Claimant was feeling "ok" and that his medications were "working alright." (Tr.

11

at 734.)  Claimant reported that medication kept him "even" and that he had no panic attacks.  Dr. Ahmad's diagnoses remained the same.  (Tr. at 734.)  A treatment note dated February 13, 2006, indicates Claimant was seen on this date and that Claimant wished to have his medication changed.[4]  The source diagnosed major depressive disorder, recurrent and panic disorder without agoraphobia.  (Tr. at 733.)

On May 3, 2006, Mr. Browning completed an updated social history.  Mr. Browning diagnosed major depressive disorder, recurrent and panic disorder without agoraphobia on Axis I.  He made no Axis II diagnosis.  Mr. Browning rated Claimant's GAF at 65.  (Tr. at 731.)

The record includes individualized outpatient treatment plans from Mr. Browning dated November 9, 2005 (GAF of 55), February 8, 2006 (GAF of 55), May 12, 2005 (GAF of 55) and May 3, 2006 (GAF of 55).  (Tr. at 737-44.)

On May 10, 2006, W. H. Donahoe, M.D., acting director of Logan Mingo Area Mental Health, Inc., completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on which he opined that Claimant had a poor ability to deal with the public, use judgment, deal with work stresses, function independently, maintain attention and concentration, understand, remember and carry out

---

[4] Comparing handwriting on a later assessment (Tr. at 745-47), it appears that this treatment note was authored by W.H. Donahoe, M.D.

complex job instructions and relate predictably in social situations.  (Tr. at 745-47.)

The record includes treatment notes from Dr. Donahoe dated May 10, 2006, and August 8, 2006.  On May 10, 2006, Claimant was still depressed, and Dr. Donahoe prescribed Prozac and Trazadone.  His diagnoses were the same as those of Dr. Ahmad.  (Tr. at 748.)  On August 8, 2006, Claimant reported problems sleeping.  Dr. Donahoe's diagnoses remained the same.  (Tr. at 748.)

The record includes additional treatment notes from Dr. Agas dated May 11, 2006, through August 9, 2006.  (Tr. at 750-54.)

On January 2, 2003, Edward J. Herba, M.D. conducted a electrophysiological study of the lower extremity at the request of Dr. Agas.  Dr. Herba stated that the lower extremity study findings show evidence consistent with bilateral L4, S1 radiculopathy affecting the bilateral peroneal and tibial nerve distributions, extending primarily into the right foot.  Dr. Herba recommended an MRI.  (Tr. at 757.)

On January 6, 2003, Claimant underwent ultrasonography of the spine, which showed no significant abnormal focal lesions. In the paraspinal musculotendinous units, Claimant had some subtle areas of heterogeneous signal inhomogeneities of unclear etiology.  (Tr. at  769.)

On September 14, 2006, Dr. Agas completed a Medical Assessment of Ability to do Work-Related Activities (Physical) on which he

opined that Claimant could lift no more than twenty pounds; that Claimant could stand/walk two to three hours in an eight-hour workday and would need to alternate his ability to sit, stand and lie down; that Claimant could sit up to two hours and do so uninterrupted for thirty minutes at a time; that Claimant could never climb or crawl, but could occasionally balance, stoop, crouch and kneel; that Claimant could not reach long distances; that Claimant's ability to push/pull was affected by his back impairment; and that Claimant should avoid heights, moving machinery and vibration.  (Tr. at 771-73.)

The record includes additional treatment notes from Dr. Agas dated June 9, 2006, through September 8, 2006.  (Tr. at 775-79.)

At the first administrative hearing on the current application, Claimant testified that he has depression and that he breaks down at times and cries.  He reported a poor mood and stated that crowds bother him.  (Tr. at 820.)  Claimant reported that he sees a counselor at Logan Mingo Mental Health once a month, but that recently because of insurance, he would begin seeing the counselor once every two months.  (Tr. at 821.)  He testified that he sees a psychiatrist every three months.  (Tr. at 820.)  Claimant reported that medication and counseling have helped his condition and that his psychiatrist had just prescribed a sleeping medication because he had not been sleeping well.  (Tr. at 821-22.)  Claimant reported a loss of interest in hobbies, including attending

football games and going fishing.    (Tr. at 824.)    Claimant testified that he drinks alcohol four times a week and has five to six beers each time he drinks.   (Tr. at 825.)  Claimant agreed that on the previous application he testified he was suicidal at times, but that he is no longer suicidal.[5]  (Tr. at 827.)

At the supplemental administrative hearing, Claimant testified that he drinks three to four beers about three to four days per week.  (Tr. at 797.)  He testified that while medication helps him sleep, he continues to wake up every hour and a half.  Claimant stated that one of his medications makes him drowsy and that "when my mood, I get mood swings, and when my mood changes my attitude ... changes."  (Tr. at 798.)

At the supplemental administrative hearing, Dr. Anne Winkler was called to testify about Claimant's physical impairments.   Dr. Winkler testified that Claimant has "mild degenerative disease of the lumbar spine" and hypertension.  Dr. Winkler did not consider Claimant's hypertension to be severe.   (Tr. at 789.)  She further stated that Claimant "does have psychiatric problems, including alcohol abuse, depression, anxiety, what sounds like a component somatization, based on one report and borderline low IQ."  (Tr. at 789-90.)  Dr. Winkler stated that her opinion about Claimant's physical impairments did not take into account Claimant's

---

[5] At the administrative hearing on the previous application, Claimant testified that before he began treatment at Logan Mingo Mental Health, he "was having bad thoughts and that finally got straightened out."  (Tr. at 837.)

psychiatric problems since she was not an expert in that area. (Tr. at 792.)  She testified that Claimant could lift or carry twenty pounds occasionally, fifteen pounds frequently; stand or walk six hours in an eight-hour workday; occasionally climb stairs and ramps, kneel, crouch, crawl and stoop; never climb ladders, ropes or scaffolds; frequently balance; and should avoid unprotected heights. (Tr. at 792.)  Dr. Winkler testified that with mild degenerative disc disease, Claimant should not have significant pain. (Tr. at 793.)  Dr. Winkler stated that she discounted nerve conduction studies by Dr. Herba (Tr. at 790), but on cross-examination, she acknowledged that "they were considering radiculopathy ... [o]bviously, they can't be considered radiculopathy based on the normal MRI in terms of ... lack of nerve root impingement or spinal cord impingement." (Tr. at 793.)

At the supplemental hearing, the vocational expert testified that with the following limitations, Claimant could perform the unskilled jobs of small parts assembler, parking lot attendant and nongovernmental mail clerk: (1) light work; (2) the ability to stand six hours in an eight-hour workday, walk one hour at a time, and stand two hours at a time up to six hours; (3) an occasional ability to climb ramps and stairs, stoop, kneel, crouch and crawl; (4) a frequent ability to balance; (5) no concentrated exposure to vibration; and (6) no exposure to hazards, including unprotected heights and dangerous equipment. (Tr. at 801-02.)  The vocational

16

expert testified that the jobs identified would be eliminated if Claimant had a poor ability to maintain attention and concentration, as opined by Dr. Donahoe.  (Tr. at 806.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to properly consider the ALJ's finding on the previous application related to Claimant's limitations, particularly mental limitations; (2) the ALJ improperly dismissed the opinion of the two treating sources, Dr. Donahoe and Dr. Agas; (3) the ALJ failed to consider Claimant's impairments in combination; and (4) the ALJ erred in his pain and credibility assessment.  (Pl.'s Br. at 13-18.)

The Commissioner argues that (1) substantial evidence supports the Commissioner's decision that Claimant retained the residual functional capacity to perform unskilled work; (2) there is no conflict between the ALJ's prior decision and the current decision; (3) the ALJ did not err in the weight afforded the medical evidence of record from Claimant's treating sources; and (4) the ALJ properly considered Claimant's subjective complaints of pain. (Def.'s Br. at 13-19.)

Claimant first takes issue with the ALJ's findings related to Claimant's mental impairment on the current application as compared to the ALJ's findings related to Claimant's mental impairment on the previous application.  In the ALJ's decision dated April 2,

2004, the ALJ found that Claimant had severe depression.   As a result, he limited Claimant to routine, repetitive tasks, among others.   (Tr. at 24.)

In the ALJ's current decision, dated April 25, 2007, which considered the time period from July 6, 2004, the date of the current application, through the expiration of Claimant's insured status on December 31, 2006, the ALJ found that Claimant's mental conditions of depression, anxiety, alcohol abuse, and borderline low IQ were not severe impairments.   The ALJ found that Claimant had mild restriction in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence and pace and no episodes of decompensation.   (Tr. at 417.)   Thus, the ALJ concluded that although medically determinable, these impairments were not severe. (Tr. at 417.)

Within the Fourth Circuit, Acquiescence Ruling ("AR") 00-1(4), 2000 WL 43774 (Jan. 12, 2000), addresses the decisions of the Fourth Circuit in <u>Lively v. Secretary of Health and Human Servs.</u>, 820 F.2d 1391 (4th Cir. 1987) and <u>Albright v. Commissioner of the Soc. Sec. Admin.</u>, 174 F.3d 473 (4th Cir. 1999).

In <u>Lively</u>, the claimant filed a previous application for benefits in which he was found capable of light work.   By decision dated October 19, 1981, the ALJ denied Claimant's application for benefits, and the decision became final after the Appeals Council

18

affirmed the ALJ's decision.  On November 3, 1981, several weeks
after the ALJ's denial of the claimant's claim, claimant turned
fifty-five years of age and, as a result, would have met the
Medical-Vocational Guidelines for disability for an individual of
advanced age limited to light work.  Lively, 820 F.2d at 1392.
Claimant filed a subsequent application on December 14, 1983, and
the ALJ, without discussing the 1981 finding that claimant was
limited to light work, found that claimant could perform work at
any exertional level.  Citing principles of res judicata, the
Fourth Circuit in Lively reversed and remanded the district court's
decision affirming the denial of benefits, stating that

> [i]t is utterly inconceivable that his condition had so
> improved in two weeks as to enable him to perform medium
> work. Principles of finality and fundamental fairness
> drawn from [42 U.S.C.] § 405(h), as discussed above,
> indicate that the Secretary [now Commissioner] must
> shoulder the burden of demonstrating that the claimant's
> condition had improved sufficiently to indicate that the
> claimant was capable of performing medium work.
> Certainly, there was no evidence of any such miraculous
> improvement, and ... such evidence, not considered in the
> earlier proceeding, would be needed as an independent
> basis to sustain a finding contrary to the final earlier
> finding.

Id. (citations omitted).  After Lively, the Commissioner issued
Acquiescence Ruling 94-2(4).  In AR 94-2(4), the Commissioner
explained that under existing policy, in considering a subsequent
claim involving an unadjudicated period,

> SSA considers the issue of disability with respect to the
> unadjudicated period to be a new issue that prevents the
> application of administrative res judicata.  Thus, when
> adjudicating a subsequent disability claim involving an

19

> unadjudicated period, SSA considers the facts and issues
> de novo in determining disability with respect to the
> unadjudicated period.

AR 94-2(4), 1994 WL 321954, at *2 (July 7, 1994).  In AR 94-2(4),

the Commissioner interpreted <u>Lively</u> to mean that

> where a final decision of the Secretary after a hearing
> on a prior disability claim contained a finding about a
> claimant's residual functional capacity, the Secretary
> may not make a different finding in adjudicating a
> subsequent disability claim with an unadjudicated period
> arising under the same title of the Act as the prior
> claim unless there is new and material evidence relating
> to the claimant's residual functional capacity.

<u>Id.</u>  Thus, pursuant to AR 94-2(4), within the Fourth Circuit

> [w]hen adjudicating a subsequent disability claim with
> an unadjudicated period arising under the same title of
> the Act as the prior claim, adjudicators must adopt such
> a finding from the final decision by an Administrative
> Law Judge or the Appeals Council on the prior claim in
> determining whether the claimant is disabled with respect
> to the unadjudicated period unless there is new and
> material evidence related to such a finding.

<u>Id.</u>, AR 94-2(4), 1994 WL 321954, at *3.

In <u>Albright v. Commissioner of the Soc. Sec. Admin.</u>, 174 F.3d

473 (4th Cir. 1999), the Fourth Circuit revisited <u>Lively</u> and

commented on AR 94-2(4).  In <u>Albright</u>, the claimant filed previous

applications for benefits, which were denied by decision dated May

28, 1992, because claimant did not meet the twelve-month duration

requirement.  <u>Id.</u> at 474.  Claimant filed a second round of

applications and, applying AR 94-2(4), the claimant's applications

were denied based not on an evaluation of the claimant's physical

condition, but instead on AR 94-2(4).  In the decision, the ALJ

20

noted that the claimant's initial claims had failed at the second step of the sequential analysis and absent new and material evidence regarding the severity of the alleged impairment, AR 94-2(4) directed that the claimant's claims must be denied again. Id. at 474-75.

The Fourth Circuit, affirming the decision of the district court reversing and remanding the Commissioner's decision, pointed out that AR 94-2(4) "erects an absolute bar to an award of benefits, unless [claimant] can produce new and material evidence that his impairment increased in severity by June 30, 1995, when his insured status expired." Id. at 475. The court concluded that AR 94-2(4) "is not an accurate restatement of our decision in Lively." Id. at 478.

In Albright, the Fourth Circuit acknowledged that the Commissioner treats a "second or successive application for disability benefits as a claim apart from those earlier filed, at least to the extent that the most recent application alleges a previously unadjudicated period of disability" and "absent an identity of claims, principles of claim preclusion ... do not apply." Id. at 476. The court in Albright indicated that the Commissioner's treatment of "later-filed applications as separate claims is eminently logical and sensible, reflecting the reality that the mere passage of time often has a deleterious effect on a claimant's physical or mental condition." Id. The court concluded

21

that "[c]ontrary ... to the principles of claim preclusion long
understood to apply in Social Security cases, AR 94-2(4) operates
to mechanistically merge two claims into one." Id. As the court
explained, "[t]he claimant's failure of proof as to but one of
these facts [a claimant must prove to demonstrate entitlement to
benefits] dooms his claim and, in light of the Ruling's preclusive
effect, any subsequent claim. In practice, then, AR 94-2(4) carves
out an exception to the general rule that separate claims are to be
considered separately." Id.

The court in Albright pointed out that AR 94-2(4) would almost
always work to the claimant's detriment, and that Lively was the
rare case where this was not the outcome. The court explained that

> [u]nlike the Ruling at issue in this case, however, the
> prior adjudication in Lively -- though highly probative
> -- was not conclusive. We took pains to point out that,
> had the agency produced substantial evidence of
> improvement in Lively's condition 'to indicate that [he]
> was capable of performing medium work,' the prior finding
> to the contrary need not have been sustained.

Id. at 477 (quoting Lively, 820 F.2d at 1392).

The court in Albright reasoned that a strict application of AR
94-2(4) would require a pronouncement that as a matter of law, the
claimant's ability to perform in the workplace could not have
diminished between May 28, 1992, when the initial claim was
decided, and June 30, 1995, when his insured status expired. The
court explained that it disagreed "with the Commissioner that
Lively abrogated the established law of preclusion, thereby

22

compelling us to embrace the potential inequities resulting therefrom." Id. at 477.   Instead, the court stated that Lively had little to do with preclusion: "Rather than signaling a sea change in the law of preclusion, the result in Lively is instead best understood as a practical illustration of the substantial evidence rule." Id.   The court went on to state:

> [i]n other words, we determined that the finding of a qualified and disinterested tribunal that Lively was capable of performing only light work as of a certain date was such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence.

Id. at 477-78.   The court cautioned that "[a]lthough we might state with some assurance that a claimant's condition remains unchanged within a discrete two-week period, we would grow ever less confident as the timeframe expands.   Where, as here, the relevant time period exceeds three years, our swagger becomes barely discernible." Id. at 477.

After Albright, the Commissioner rescinded AR 94-2(4) and replaced it with AR 00-1(4).   65 Fed. Reg. 1936-01, 2000 WL 17162 (Jan. 12, 2000).   In AR 00-1(4), the Commissioner explained that under existing policy: "SSA does not consider prior findings made in the final determination or decision on the prior claim as evidence in determining disability with respect to the unadjudicated period involved in the subsequent claim."   AR 00-1(4), 2000 WL 43774, at *3 (Jan. 12, 2000).   The Commissioner explained how it would apply Albright in the Fourth Circuit:

23

When adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

Where the prior finding was about a fact which is subject to change with the passage of time, such as a claimant's residual functional capacity, or that a claimant does or does not have an impairment(s) which is severe, the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increases. An adjudicator should give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g., a few weeks as in Lively. An adjudicator generally should give less weight to such a prior finding as the proximity of the period previously adjudicated to the period being adjudicated in the subsequent claim becomes more remote, e.g., where the relevant time period exceeds three years as in Albright. In determining the weight to be given such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis.

Id., 2000 WL 43774, at *4.

In the ALJ's April 2, 2004, decision on the previous application, the ALJ concluded that Claimant suffered from severe depression, lumbosacral disc disease and chronic pain syndrome.

24

(Tr. at 19.)  The ALJ found that Claimant had mild restriction in activities of daily living, mild difficulties in social functioning, moderate difficulties in maintaining concentration, persistence and pace and no episodes of decompensation.  (Tr. at 19.)

On the prior application, the ALJ considered treatment notes from Mr. Browning and Dr. Ahmad from 2002 and 2003, as well as a Medical Assessment of (Mental) Ability to do Work-Related Activities completed by Dr. Ahmad and Mr. Browning in December of 2002.  (Tr. at 15-19.)  On the assessment, these treating sources opined that Claimant had several areas of poor functioning, but the ALJ afforded them little weight because they were inconsistent with Claimant's GAF of 60, not well supported by the longitudinal record and not well explained.  (Tr. at 17.)

The ALJ concluded on the prior application that Claimant was limited to light work, that he required a sit/stand option, that he could walk no more than a half-mile at a time, that he was unable to squat, stoop, crouch, kneel or crawl, that he could bend no more than to a slight degree, that he must avoid dangerous situations and that he could only perform routine, repetitive tasks.  (Tr. at 22.)

In the ALJ's current decision, the ALJ found that Claimant could perform light work, that Claimant was able to walk only one hour at a time; that he could stand only two hours at a time, but

in any event, not over six hours in an eight hour day; that he had no limit in sitting or in pushing/pulling "other than weight already indicated" (Tr. at 417); that he could occasionally climb stairs and ramps, kneel, crouch, crawl and stoop; that he was unable to climb ropes, ladders or scaffolds; that he could have no concentrated exposure to vibration; and that Claimant could have no exposure to hazards such as unprotected heights. (Tr. at 417.)

In his decision, the ALJ acknowledges his obligation under AR 00-1(4) (Tr. at 415), and, as noted above, eventually concludes that Claimant's mental impairment(s) are no longer severe and that Claimant's physical impairments do not cause the same limitations as before. The ALJ states in his decision that "[i]t is noteworthy that the evidence presented for the current claim in these areas, while differing from evidence presented in the previous claim shows continuing conservative treatment for both mental and physical conditions, as explained below." (Tr. at 419.)

In making the finding related to Claimant's mental impairments, the ALJ summarizes Claimant's treatment history both before and during the relevant time period. (Tr. at 423-24.) The ALJ further explains in his decision that he afforded

> significant weight to the contemporaneous longitudinal medical records, diagnoses, observations, and opinion of Dr. Ahmad, as treating physician; but can accord little weight to the records of the unknown person, albeit presumably a physician, who treated the claimant in 2006. As for the records of Mr. Browning, who is not a "medically acceptable source" but an "other source" as defined in 20 CFR 404.1513, such evidence cannot

26

establish a diagnosis or a medical opinion, but may be
used to show the severity of the claimant's impairment(s)
and how it affects the claimant's ability to function;
therefore, his diagnoses and GAF can be accorded no
weight, but his observations can be considered and
evaluated using all the factors identified in 20 CFR
404.1527(d)(3) through (6).

(Tr. at 424.)

Regarding the opinion of Dr. Donahoe, the ALJ explained that

even though Dr. Donahoe is the treating physician for
mental conditions, his opinions are not well supported by
medically acceptable clinical and laboratory techniques,
and are not consistent with the other substantial
evidence of record; therefore, his opinions are not
entitled to controlling weight, but are considered and
evaluated using all the factors identified in 20 CFR
404.1527(d)(3) through (6).  For example, there is no
basis in the record for Dr. Donahoe's comment that the
claimant has poor concentration; no mention of this trait
is in the records from Logan-Mingo Area Mental Health;
the only mention in the records submitted with the
current claim is in the Independent Medical Examination
done for Workers' Compensation in April 2003, when
psychiatrist Ahmed D. Faheem, M.D. noted on the mental
status examination that the claimant had normal attention
and concentration, and licensed psychologist Sunny Bell,
M.A., noted concentration was within normal limits ....
Additionally, on the medical source statement, Dr.
Donahoe opines the claimant's chronic back problems
including nerve root damage, poor concentration, Major
Depressive Disorder, and Generalized Anxiety Disorder,
would limit any job for the claimant; there is no basis
in the record for this sweeping generalization.

(Tr. at 425.)

The ALJ then summarized evidence from Dr. Faheem and Ms. Bell,

noting that it predated Claimant's alleged onset, but that "it is

the only complete psychiatric/psychological evaluation in file and

was submitted for consideration in this most recent application

...."  (Tr. at 425.)  As to Ms. Bell's findings, the ALJ stated

27

that he accorded "some weight" to her diagnosis of borderline intellectual functioning. Regarding her diagnoses of depression and alcohol abuse, "these are accorded significant weight, but the undersigned has considered the evidence of record, as a whole, as well." (Tr. at 426.) As to Dr. Faheem, the ALJ noted Dr. Faheem's opinion that "the psychiatric problems by themselves were not disabling, and are not progressive ...." (Tr. at 426.) The ALJ accorded "significant weight to the examination, evaluation, diagnoses, observations, and opinions of this examining specialist, but has considered the evidence of record as a whole, as well." (Tr. at 426.)

The ALJ noted the opinion of Dr. Winkler at the supplemental administrative hearing that Claimant had severe alcohol abuse, depression, anxiety and borderline low IQ, but also noted that she declined to address the Claimant's psychiatric/psychological condition, as an issue outside her area of expertise. (Tr. at 421.)

The ALJ noted the September 13, 2004, opinion of the State agency medical source who opined that Claimant's borderline intellectual functioning, mood disorder, panic disorder and alcohol abuse were severe (giving controlling weight to the opinion of the ALJ in the April 2004, decision) and resulted in a moderately limited ability to carry out detailed instructions. (Tr. at 426.) The ALJ also noted that the second State agency medical source

opined on March 10, 2005, that Claimant's mental impairments were not severe. (Tr. at 426-27.) The ALJ does not explain the weight afforded these opinions.

Later in his decision, the ALJ summarized Claimant's testimony about his mental condition and treatment he has received related to his mental condition. The ALJ noted that Claimant reported symptoms of depression, including crying, "not real good" mood and aversion to crowds. Claimant has monthly counseling sessions with his counselor, Woody Browning, but recently, due to insurance, he now receives counseling once very two months. Claimant sees a psychiatrist (formerly Dr. Ahmad, but now Dr. Donahoe) every three months for medication. Claimant reported that talking with his counselor is helpful and that medication helps his condition. Claimant acknowledged at the previous hearing that he had testified he was sometimes suicidal, Claimant stated he was no longer suicidal. Claimant also reported medication side effects, including mood swings, depression and attitude change, among others. (Tr. at 420.)

Finally, the ALJ concludes that

[t]he record[s] from treating psychiatrist(s) at Logan-Mingo Area Mental Health show the claimant's treatment is relatively infrequent, every 2 to 3 months, with no acute periods of exacerbation; the claimant is noted to do all right when he takes his medication, staying on an even keel once his medication is adjusted; and he does even better when he cuts down on the amount of alcohol he drinks. Although the claimant testified to his psychological symptoms, he also testified it has helped to talk to a counselor and his medications also help, by

29

keeping him level.  At the second hearing, the claimant
testified he has side effects from his medication of
nerve[s] and depression, mood swings, attitude change,
and upset stomach; Trazadone makes him drowsy in the
mornings and makes him moody; the undersigned finds this
appears to be a temporary situation involving side
effects which may necessitate medical adjustment.

(Tr. at 427.)

The ALJ's determination that Claimant does not suffer a severe
mental impairment is not supported by substantial evidence and is
not in keeping with AR 00-1(4).  The ALJ's previous decision on
April 2, 2004, preceded Claimant's current application on July 6,
2004, by only three months.  AR 00-1(4) directs that "[a]n
adjudicator should give greater weight to such a prior finding when
the previously adjudicated period is close in time to the period
being adjudicated in the subsequent claim, e.g., a few weeks as in
Lively."  AR 00-1(4), 200 WL 43774 at *4.

The evidence of record related to Claimant's current
application does not indicate a change in Claimant's mental
condition, such that his mental impairment is no longer severe.
Instead, it indicates Claimant's condition remained much the same,
he continued to have complaints of depression and anxiety and
received ongoing mental health treatment from Mr. Browning, Dr.
Ahmad and, more recently, Dr. Donahoe.

The ALJ simply did not conduct an analysis that sufficiently
complies with AR 00-1(4).  The ALJ's statement that "[i]t is
noteworthy that the evidence presented for the current claim ...,

while differing from evidence presented in the previous claim, shows continuing conservative treatment for both mental and physical conditions, as explained below," best reveals the flaw in the ALJ's reasoning related to Claimant's mental impairments. (Tr. at 419.) On the current application, the ALJ, faced with very similar evidence of record related to Claimant's mental condition (ongoing treatment for depression and anxiety) reached a different conclusion about the effect of Claimant's mental impairments on his ability to function. The court cannot discern from the ALJ's decision why he believed that Claimant's mental condition had changed, i.e., improved, to the point where Claimant did not suffer severe mental impairments.

Claimant continued to receive regular mental health counseling from Mr. Browning and was treated by Dr. Ahmad and Dr. Donahoe on a regular basis. Mr. Browning's GAF ratings were in the mid 50s during the relevant time period, which was a slight decrease from the prior time period where Claimant's GAF scores were in the 60s.

Even Dr. Winkler testified that Claimant had psychiatric problems, including alcohol abuse, depression, anxiety and a component somatization and borderline IQ. (Tr. at 789-90.) Although she could not speak to the limitations related to Claimant's mental impairments as outside her area of expertise, her testimony certainly reveals that she believed Claimant had mental impairments that affected his residual functional capacity.

31

Likewise, Dr. Lambrechts, the State agency medical source wrote that "[h]is mental status does not look good as he appears to be more depressed than before."  (Tr. at 659.)

The ALJ's explanation about the weight afforded the opinions of Dr. Faheem and Ms. Bell, evidence that predates the relevant time period on the current application (but was not before the ALJ on the prior application), also is problematic.  The ALJ states in his decision as to both of these sources, that he accorded "significant weight" to Ms. Bell's diagnoses and Dr. Faheem's examination, evaluation, diagnoses, observations, and opinions, but that he "considered the evidence of record as a whole."  (Tr. at 426.)   This explanation does not provide the court with an understanding of the weight afforded these opinions, and is not in keeping with 20 C.F.R. § 404.1527(d) (2007).

Furthermore, the ALJ does not explain why he apparently rejected the opinion of the State agency medical source, Dr. Lilly, that the ALJ's previous findings about Claimant's mental impairments should be given controlling weight, that Claimant's mental impairments, therefore, were severe and that Claimant was limited to routine, repetitive tasks.  Curiously, Dr. Lilly also opined that Claimant had only mild or no limitations in the four areas of functioning.  While another State agency medical source, Dr. Soloman, opined that Claimant's mental impairments were not severe, he too stated that the previous residual functional

capacity finding should be given "full weight." (Tr. at 646.) The ALJ does not resolve the inconsistencies in these opinions, and the court finds this particularly problematic in light of AR 00-1(4)'s directive.

Finally, the ALJ rejects the opinion of Dr. Donahoe that Claimant has poor concentration because there is no evidence in the Logan-Mingo Area Mental Health records noting this trait and Dr. Faheem and Ms. Bell both found, in 2003, that Claimant had normal attention and concentration. The ALJ relies on evidence from 2003 to find that Claimant had normal concentration, when his prior decision related to that very same time period, found that Claimant had a moderate limitation in concentration.

The Commissioner asserts that any error by the ALJ in failing to include the limitation of simple, routine and repetitive tasks was remedied when he asked the vocational expert whether unskilled work existed that Claimant could perform. The Commissioner asserts that "simple, routine work" as found in the prior decision is comparable to "unskilled" work found in the current decision. (Def.'s Br. at 14.) Given the specific requirements of AR 00-1(4), the court cannot conclude that asking the vocational expert to identify unskilled jobs remedies the error noted above.

In addition, the court finds that the ALJ's decision is not supported by substantial evidence because the previous residual functional capacity finding included a sit/stand option, and,

without sufficient explanation, the ALJ's current decision did not include such a limitation. The State agency medical source, Dr. Lambrechts, who indicated his awareness of the previous decision, stated that such a limitation was appropriate. The ALJ acknowledged Dr. Lambrechts' opinion in his decision (Tr. at 423), and eventually indicated that the opinions of the State agency physicians supported a finding of not disabled (Tr. at 428). The ALJ apparently rejected the inclusion of a sit/stand option in the residual functional capacity finding without an explanation as to why a sit/stand option was no longer necessary. The court finds this problematic in light of the opinion of Dr. Lambrechts, who acknowledged the Commissioner's obligations under AR 00-1(4). The ALJ heavily relied on the opinion of Dr. Winkler, who did not find such a limitation, but she was not made aware of the specific requirements of AR 00-1(4) or asked if there had been a change in Claimant's condition during the relevant time period as compared to the time period covered in the previous application. As a result, the court cannot conclude that the ALJ's physical residual functional capacity finding fully complies with AR 00-1(4).

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is not supported by substantial evidence. Accordingly, by Judgment Order entered this day, this matter is REVERSED and REMANDED for further administrative proceedings pursuant to the fourth sentence of 42

U.S.C. § 405(g) and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: March 18, 2010

*Mary E. Stanley*

Mary E. Stanley
United States Magistrate Judge